UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

STATE OF CONNECTICUT          :        ss: Hartford, CT
                              :
                              :
COUNTY OF HARTFORD            :        June 24, 2021

## AFFIDAVIT

I, Michael Breen, a Task Force Officer with the Drug Enforcement Administration,

having been duly sworn, state:

## INTRODUCTION

1.      I am an investigative or law enforcement officer of the United States within the

meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States

who is empowered by law to conduct investigations of and to make arrests for offenses enumerated

in Section 2516 of Title 18 of the United States Code. I have been employed as a Police Officer

with the Rocky Hill (CT) Police Department since 2012. From December 2016 to the present I

have been assigned to the Drug Enforcement Administration ("DEA") Hartford Resident Office

("HRO") as a Task Force Officer ("TFO"). Prior to being assigned to the DEA, I was assigned to

a regional narcotics unit (Mid state Narcotics Task Force) from November 2015 until December

2016. As a DEA Task Force Officer, I have participated in numerous investigations concerning

violations of federal narcotics and firearms laws. I have coordinated controlled purchases of illegal

drugs utilizing confidential sources and cooperating witnesses. I have obtained/participated in the

execution of search and arrest warrants pertaining to individuals involved in the distribution of

controlled substances, conducted electronic surveillance and physical surveillance of individuals

involved in the distribution of controlled substances, analyzed records documenting the purchase

and sale of illegal drugs, spoken with informants and subjects, as well as other local, state and

1

Federal law enforcement officers, regarding the manner in which narcotics traffickers obtain, finance, store manufacture, transport, and distribute illegal drugs. I have received instruction relative to conducting drug investigations while attending in-service training at the Connecticut Police Academy (POSTC) in Meriden, CT. In addition, I also attended a two- week course hosted by the Drug Enforcement Administration in which I received specialized training in the field of narcotics investigations. I also receive periodic in-service training relative to conducting drug investigations.

2.      I am currently assigned to the DEA HRO and have been participating in an investigation into the activities of a drug trafficking organization (DTO) that is operating out of Hartford, CT.

3.      I make this Affidavit in support of criminal complaints and arrest warrants for Shabazz VALENTINE, Rigoberto MATEO-SILVA, a.k.a. "BORI", ████████ , Jamahl EDWARDS, and ████  ██████████ a.k.a ████████ , on charges of conspiracy to possess with intent to distribute and to distribute controlled substances, in violation of 21 U.S.C. §§ 846 and 841(a)(1), and possession with intent to distribute and distribution of controlled substances, in violation of 21 U.S.C. § 841(a)(1) (collectively, the "Target Offenses").

4.      I also make this affidavit in support of an application for search and seizure warrants to search the following premises:

a.      **532 S. Main Street, New Britain, CT (Subject Premises #1):** 532 S Main Street is a single-family brick home with a black shingle roof and white trimmed windows. The numerals "532" are clearly marked in black on the bottom of the front door. In the front of the residence, there is a front porch accessing the main front door of the residence. In addition, there is a second access door on the east side of the residence along the main driveway of the

home. The driveway continues to the east side of the property and leads to the secondary access of the residence as well as a detached shed.

        b.    **90 Gerald Drive, Vernon, CT (Subject Premises #2):** 90 Gerald Drive is a single family tan colored home with a tan shingle roof and white trimmed windows. In the front of the residence there is a concrete porch that allows access to the front entrance of the residence. On the south side of the residence there is an attached garage that has one oversized garage door. The numerals "90" are affixed to the black mailbox that is located directly across from the residence on the west side of the street.

## RELEVANT FACTS

### Overview of the Investigation

      5.    Since 2017, DEA in Alexandria, VA has been investigating a drug trafficking organization ("DTO") that is selling fentanyl, heroin and cocaine in the area of Virginia, Washington D.C. and Maryland. DEA Virginia (VA) identified several members of this DTO and determined that a source of supply for narcotics was located in the area of Los Angeles, CA. Throughout the investigation, investigators in VA made seizures of large quantities of narcotics. In addition, investigators in VA seized large amounts of U.S. currency believed to be derived from and used for narcotics sales and purchases. Investigators in VA and CA also made arrests of several members of this DTO.

      6.    Throughout the investigation, VA DEA identified Hugo NAVARRO-Galvan, Roberto RAMIREZ, Michael BARROSO and Raul NAVARRO-Galvan as members of this DTO. Raul NAVARRO-Galvan who resides in CA was identified as the source of supply of narcotics for several targets residing in the greater VA area. The investigation revealed that NAVARRO-Galvan was supplying multi kilogram quantities of narcotics to several individuals.

3

These individuals would regularly travel to CA with large quantities of U.S. currency, which would then be provided to NAVARRO-Galvan to purchase the narcotics.

7.      In June of 2020, DEA HRO investigators received information from DEA VA regarding a drug trafficking and money laundering organization operated by Shabazz VALENTINE and his associates. DEA HRO investigators learned that the VALENTINE DTO was obtaining wholesale quantities of fentanyl and cocaine from Raul NAVARRO-Galvan. The VALENTINE DTO was then selling the wholesale quantities of narcotics in the greater Hartford, CT area. Further, the VALENTINE DTO would receive large amounts of U.S. currency (narcotics proceeds) in exchange for the sale of narcotics. Thereafter, the VALENTINE DTO would transport the U.S. currency (narcotics proceeds) back to California to the source of supply.

### Evidence from a Confidential Source
### regarding VALENTINE and MATEO-SILVA

8.      During the month of June 2020, NAVARRO-Galvan was arrested in CA. During his arrest, investigators seized large quantities of narcotics and U.S. currency. Investigators in VA also arrested several individuals tied to this DTO. Subsequent to NAVARRO-Galvan's arrest, investigators conducted searches of telephones being used by NAVARRO-Galvan. Within the content of these telephones, investigators located communications between NAVARRO-Galvan and two individuals identified as "SHABBAS" (later identified as Shabazz VALENTINE) and "BORI" (later identified as Rigoberto MATEO-SILVA). It should be noted that NAVARRO-Galvan was communicating with SHABAZZ (VALENTINE) and BORI (MATEO-SILVA) telephonically on a regular basis, and that NAVARRO-Galvan was communicating with SHABAZZ over 424-421-4425 and with BORI over 860-515-0092. The content of the conversations between NAVARRO-Galvan and SHABAZZ and BORI was for the purpose of coordinating narcotics purchases. SHABAZZ and BORI would communicate with

4

NAVARRO-Galvan to setup times to travel to CA to meet with NAVARRO-Galvan, setup payments that were owed for previous purchases of narcotics, coordinate the purchase of new product, and make arrangements for the travel and accommodations relating to their trips to CA.

9.     During the month of June 2020, DEA VA developed a confidential source (the "CS") who had information regarding the DTO that they were investigating.[1] During this investigation, investigators have obtained substantial and detailed information from the CS. Investigators have found the information provided by the CS to be accurate and reliable. Information provided by the CS has led to seizures of substantial amounts of narcotics. In addition, information provided by the CS has been corroborated by substantial other evidence, including physical surveillance, narcotics seizures, money seizures, toll records, pen data, ping information and other evidence.

10.     The CS identified SHABAZZ and BORI as narcotics traffickers who resided in Connecticut. The CS further indicated that SHABAZZ and BORI had been purchasing large quantities of fentanyl and cocaine from NAVARRO-Galvan for approximately one year. SHABAZZ and BORI would regularly travel from Connecticut to California to meet with NAVARRO-Galvan. During these meetings, SHABAZZ and BORI would provide NAVARRO-Galvan with large quantities of U.S. currency and, in exchange, SHABAZZ and BORI would receive multi-kilogram loads of fentanyl and cocaine.

11.     The CS further indicated that SHABAZZ and BORI currently owed NAVARRO-Galvan approximately $1,100,000 in U.S. currency for previously obtained narcotics. In addition, SHABAZZ and BORI were going to purchase approximately $300,000 to 400,000

5

worth of new product from NAVARRO-Galvan in the near future. The CS indicated that
SHABAZZ and BORI would regularly fly from Connecticut/Boston to California with large
amounts of U.S. currency (i.e., narcotics proceeds) that were provided to NAVARRO-Galvan as
payment for the narcotics.

**Surveillance of VALENTINE, MATEO-SILVA and** ███████

12.     On June 24, 2020, U.S. Magistrate Judge Robert A. Richardson authorized the
installation of a pen register and the disclosure of E-911/ping data for telephone numbers 424-
421-4425 (which was used by VALENTINE) and 860-518-0092 (which was used by MATEO-
SILVA).

13.     On June 26, 2020, investigators using location information from telephone
number 424-421-4425 discovered that the device was pinging in the area of Route 3 in Rocky
Hill, CT. Using cell site data, investigators identified 3 Lathrop Lane, Rocky Hill, CT as the
location of the phone. Open source information revealed that Shabazz VALENTINE resided at 3
Lathrop Lane. Investigators obtained a CT DMV license photo for VALENTINE. Investigators
showed the DMV photo of VALENTINE to the CS, who positively identified VALENTINE as
the individual referred to as "SHABBAS."

14.     Investigators subpoenaed Eversource energy company for customer records
related to 3 Lathrop Lane, Rocky Hill, CT. The results showed that Shabazz VALENTINE was
the account holder for electricity at 3 Lathrop Lane Apt E, Rocky Hill, CT. Throughout the
month of July 2020, the CS had several telephonic communications with VALENTINE. During
these communications, the CS revealed that VALENTINE was planning on transporting, or
having other individuals on his behalf transport, a large amount of U.S. currency (i.e., narcotics
proceeds) from CT to CA. The U.S. currency was payment for narcotics that VALENTINE had

previously purchased. VALENTINE also planned to bring to CA additional U.S. currency to purchase a new load of narcotics. The conversations revealed that VALENTINE was going to employ several individuals who would secrete the U.S. currency within suitcases and then transport the currency via airlines to CA.

15.     On June 26, 2020, E-911 location information for telephone number 860-518-0092 (which was used by BORI) revealed that the device was pinging in the area of New Britain, CT. Investigators used cell site information to narrow down the location where the device was located. Ultimately, the device was located at 532 S Main St, New Britain, CT (**Subject Premises #1**). Investigators observed a black Jeep Wrangler parked in the driveway of 532 S Main St, New Britain, CT at the time that telephone number 860-518-0092 was pinging at that location. At approximately 6:00pm, E-911 location information for telephone number 860-518-0092 showed the device to be pinging in close proximity to Charles St, East Hartford, CT. Investigators arrived in the area and observed a heavyset light skinned male with dread style hair standing outside of 81 Charles St, East Hartford, CT. Investigators took a photograph of this individual and showed the photograph to the CS, who positively identified the individual in the photograph as "BORI." Investigators observed BORI enter into a black Jeep Wrangler and depart the area of Charles St. CT DMV records showed that the Jeep Wrangler was a rental vehicle from AVIS. AVIS records showed that the Jeep Wrangler was rented by Wilfredo MATEO-SILVA and Rigoberto MATEO-SILVA. Investigators obtained a photograph of Rigoberto MATEO-SILVA from CT DMV records. A comparison of the photograph of BORI to the CT DMV photograph of Rigoberto MATEO-SILVA revealed that BORI was in fact Rigoberto MATEO-SILVA.

7

16.     During the week of June 29, 2020, DEA HRO investigators conducted surveillance on VALENTINE, MATEO-SILVA and several of their associates. During the surveillance, investigators observed VALENTINE purchase several suitcases that VALENTINE stored at his residence at 3 Lathrop Lane, Rocky Hill, CT. Also during this week -- specifically on July 1, 2020 -- investigators observed ▮▮▮▮▮▮▮▮ at 3 Lathrop Lane, Rocky Hill, CT. ▮▮▮▮▮ left the residence with a suitcase which was placed into the silver Chevrolet Malibu that he was operating. Investigators continued to conduct surveillance on ▮▮▮▮ as he traveled to 228 Newbury St, Hartford, CT. Investigators observed ▮▮▮▮ retrieve the suitcase from the trunk of the vehicle and give it to a co-conspirator referred to as "Coconspirator A." Investigators then observed Coconspirator A bring the suitcase inside of 228 Newbury St, Hartford, CT. Investigators later learned that Coconspirator A had booked a flight from Boston Logan Airport to LAX Airport in Los Angeles on the morning of July 4, 2020. Investigators traveled to Logan Airport on July 4, 2020 in an effort to observe and interdict what was believed to be a large quantity of U.S. currency that Coconspirator A would be transporting to Los Angeles. However, Coconspirator A did not show up for his flight on the morning of July 4, 2020. Investigators later learned that Coconspirator A rescheduled his flight and that Coconspirator A flew out of Logan Airport during the afternoon of July 4, 2020. On or about July 6, 2020, Coconspirator A flew from Los Angeles back to Logan Airport.

**Seizure of approximately $700,000, Wholesale Quantities of Narcotics and Firearms**

17.     During the evening hours of July 6, 2020, investigators observed VALENTINE loading several large suitcases and other items of luggage into a white 2019 Chrysler 300 vehicle. Investigators detained VALENTINE and secured his residence at 3 Lathrop Lane, Apt. E, Rocky Hill, CT. In addition, investigators secured two suspected stash locations at 81 Charles

St, East Hartford, CT and 10 Lincoln Street, East Hartford, CT. Both of these locations were suspected stash locations for VALENTINE and his DTO.

18.    On July 6, 2020, U.S. Magistrate Judge Thomas O. Farrish authorized search warrants for VALENTINE's residence at 3 Lathrop Lane, Apt. E, Rocky Hill, CT, the vehicle operated by VALENTINE (i.e., the white 2019 Chrysler 300), and the two suspected stash locations at 81 Charles St, East Hartford, CT and 10 Lincoln Street, East Hartford, CT. In addition, investigators conducted a consent search of an apartment used by VALENTINE that is located at 390 Capitol Avenue, Hartford, CT.

19.    During the searches of these locations on July 6, 2020, investigators seized approximately $700,000 in suspected drug proceeds, substantial amounts of narcotics (which included fentanyl, heroin and cocaine), items used to process and package narcotics, and multiple firearms. Specifically, investigators seized the below-listed evidence from the following locations:

a.    **2019 Chrysler 300** – on July 6, 2020, investigators observed VALENTINE and one of his girlfriends, who is identified by the initials "AD," carrying multiple suitcases and bags from their residence at 3 Lathrop Lane in Rocky Hill, CT and putting the suitcases and bags in VALENTINE's vehicle (i.e., VALENTINE's 2019 Chrysler 300), which was parked in the lot at 3 Lathrop Lane, Rocky Hill, CT. When VALENTINE attempted to drive away from the area in his Chrysler 300, investigators stopped VALENTINE. As investigators stopped VALENTINE, an investigator observed AD run back into the apartment building at 3 Lathrop Lane, Rocky Hill, CT. A narcotics detection canine alerted to the odor of narcotics on a door handle of the 2019 Chrysler 300 and on the suitcases located within the Chrysler 300. When investigators searched the 2019 Chrysler 300, investigators seized a total of $572,722 in

9

suspected drug proceeds from the suitcases and bags located within the vehicle. Several suitcases had a false wall built inside the suitcase. When investigators removed the false wall, they found the U.S. Currency. In addition, investigators seized from VALENTINE and his Chrysler 300 three cell phones and two FedEx receipts for parcels that were mailed to the Los Angeles area on July 2, 2020.

b.    **3 Lathrop Lane, Apt. E, Rocky Hill, CT** – as noted above, when investigators stopped VALENTINE outside of his residence at 3 Lathrop Lane, an investigator observed AD run back into the apartment building. When investigators entered VALENTINE's apartment at 3 Lathrop Lane, Apt. 3, investigators found AD inside of a bathroom where she was flushing the toilet in a frenetic manner. When investigators searched 3 Lathrop Lane, Apt. 3, they found four cell phones, a money counter and proof of residence for VALENTINE. In addition, from a safe in the bedroom, investigators seized $19,102 in suspected narcotics proceeds and a 9mm firearm, along with a magazine and ammunition.

c.    **81 Charles St, East Hartford, CT** - investigators had identified 81 Charles St as a suspected stash location used by VALENTINE and his associates at the location. When investigators went to 81 Charles St, they found MATEO-SILVA and several associates. When investigators searched 81 Charles St, they found resale quantities of fentanyl, heroin and cocaine, drug processing and packaging equipment (such as, a metal press, scale, bottle of cut and zip lock bags), numerous money gram receipts, a .45 caliber handgun and $106,965 in suspected narcotics proceeds.

d.    **10 Lincoln Street, East Hartford, CT** - investigators had identified 10 Lincoln Street, East Hartford, CT as a suspected stash location used by VALENTINE and his associates. When investigators searched 10 Lincoln St, they found approximately 1,782 grams

10

(gross weight with plastic packaging) of fentanyl, approximately 65 grams (gross weight with plastic packaging) of cocaine, a money counter, numerous small cardboard boxes containing wax paper sleeves used for packaging fentanyl/heroin, a scale, a small blender with white powder residue, a glass Pyrex measuring cup with white powder residue, a .38 caliber revolver, a .40 caliber semi-automatic magazine and 28 rounds of ammunition.

   e.   **390 Capitol Avenue, Apt. 103, Hartford, CT** – investigators identified Apartment 103 at 390 Capitol Avenue, Hartford, CT as an apartment used by VALENTINE. On July 6, 2020, investigators found an adult male, an adult female and four minor children at Apartment 103 at 390 Capitol Ave., Hartford, CT. The adult male said that Apartment 103 was VALENTINE's and that the adult male was allowed by VALENTINE to sleep at the apartment. During a consent search of Apartment 103, investigators found in the bedroom closet a hooded sweatshirt with a 9mm firearm in a pocket. Within a dresser in the bedroom, investigators found a magazine with 18 rounds of live 9mm ammunition, a State of Connecticut Department of Social Security card in the name of Shabazz Valentine, U.S. Currency, a Digi Weigh scale with white powder residue, two plastic bags of suspected crack and four knotted pieces of plastic containing suspected crack. From a shoebox on the bedroom floor, investigators found five knotted pieces of plastic containing suspected cocaine/crack.

   20.   After being advised of his Miranda rights, VALENTINE said that he was not aware of any money inside of the suitcases that were seized from his vehicle (the 2019 Chrysler 300). VALENTINE initially said that anything inside of his apartment (3 Lathrop Lane, Apt. 3) was his and he would take responsibility for it. However, when asked about the safe in the bedroom closet, VALENTINE said it was not his safe and he would not reveal who owned the safe. VALENTINE admitted that he would regularly visit 10 Lincoln St, East Hartford, CT and

11

that he was at 10 Lincoln St. on July 6, 2020; however, VALENTINE would not reveal who

owned the premises at 10 Lincoln St. VALENTINE did not provide further information to

investigators.

<u>**Seizure of $200,000 & Surveillance of ████**</u>

21.     During the search of VALENTINE's Chrysler 300 on July 6, 2020, investigators

located tracking receipts for parcels that VALENTINE (or an associate) mailed to California on

July 2, 2020. On July 8, 2020, DEA investigators in Los Angeles were notified that the two

parcels associated with tracking receipts found in VALENTINE's vehicle (the Chrysler 300) had

arrived at FedEx facilities located at 2300 Wilshire Boulevard, Santa Monica, CA 90403 and

13488 Maxella Avenue, Unit 300, Marina Del Rey, CA.

22.     Investigators in Los Angeles also were conducting surveillance on Coconspirator

A as he had arrived via airplane in Los Angeles on July 8, 2020. Investigators observed

Coconspirator A leave the airport and enter into a vehicle with ████ ████. Rental records

for this vehicle later revealed that the vehicle was rented to ████ ████. DEA LA

maintained surveillance on Coconspirator A and ████ as investigators believed that they may

be traveling to the FedEx locations to obtain the two parcels that had been mailed from

Connecticut. DEA LA followed Coconspirator A and ████ as they traveled to the FedEx

facility located at 2300 Wilshire Boulevard, Santa Monica, CA. Once Coconspirator A and

████ arrived at the FedEx facility in Santa Monica, CA, investigators observed Coconspirator

A exit the vehicle and walk into the FedEx facility. It should be noted that DEA LA had already

contacted FedEx corporate security, which agreed to hold both of the parcels pending a search

warrant. Investigators observed Coconspirator A exiting the FedEx facility empty handed after a

short period of time. DEA LA continued surveillance on Coconspirator A and ████ as they

12

next traveled to the FedEx facility at 13488 Maxella Avenue, Unit 300, Marina Del Rey, CA. Investigators observed Coconspirator A and ▇▇▇ depart this FedEx facility after a short period of time. DEA LA spoke to FedEx employees and determined that Coconspirator A had in fact tried to obtain the two parcels that had been mailed from Connecticut. Coconspirator A had provided what appeared to be a fake identification card that was bearing his picture, but had the name Shabazz Valentine on it. Investigators subsequently seized the parcels from FedEx in California. Investigators in California obtained a search and seizure warrant for the parcels. During the search of the parcels, investigators seized approximately $160,000 in U.S. currency (i.e., suspected drug proceeds).

**Evidence regarding ▇▇▇▇**

23.     After the seizures of narcotics, U.S. currency, and firearms from the VALENTINE DTO during the month of July 2020, VALENTINE and MATEO-SILVA continued to communicate with the CS regarding their narcotics trafficking activities. VALENTINE informed the CS that he intended on continuing his narcotics trafficking activities by using other members of his DTO to facilitate purchasing narcotics and transporting the narcotics back to Connecticut.

24.     The CS informed investigators that VALENTINE was using a certain member of the DTO to package the narcotics and prepare the narcotics to be shipped from Los Angeles to Connecticut. Investigators later identified this individual as ▇▇▇▇▇▇▇ The CS provided your affiant with telephone number 860-▇▇▇▇ as the telephone number that was being used by ▇▇▇. The CS informed your affiant that after members of the VALENTINE DTO obtained quantities of narcotics, ▇▇▇▇ was responsible for packaging the narcotics into shipping boxes and sending the narcotics to Connecticut. Your affiant obtained a photograph of

13

████ which was shown to the CS. The CS confirmed that ████ was the individual who packaged and shipped narcotics on behalf of the VALENTINE DTO.

25.     The CS advised that █████, on behalf of VALENTINE, would travel to California on a regular basis and meet with a narcotics source of supply in California. While in California, █████ would package narcotics and ship the narcotics to Connecticut. For example, the CS advised that █████ had met with the narcotics source of supply in California on August 9, 2020 and obtained approximately 14 kilograms of fentanyl from the source so that █████ could send the narcotics via FedEx to Connecticut. The CS also informed your affiant that through conversations with VALENTINE, █████ was believed to reside in Florida. Law enforcement databases list █████ residence as 4788 Sierra Lane, Coconut Creek, FL.

26.     During the month of October 2021, the CS had telephonic communication with VALENTINE regarding a large shipment of cocaine that was being sent from California to Connecticut. VALENTINE informed the CS that █████ had sent four packages containing large quantities of cocaine from CA to CT, but that one of the boxes that arrived was empty and did not contain any kilograms of cocaine. VALENTINE informed the CS that he believed that █████ had stolen four kilograms of cocaine that were supposed to be inside of the box instead of shipping them to Connecticut.

### Seizure of Approximately 20 Kilograms of Fentanyl from █████████ and EDWARDS

27.     The CS provided information that █████ ████████ aka █████ was a narcotics courier who resided in Los Angeles, CA and used telephone number ████████ to facilitate his activities. The CS advised that █████ was involved in transporting narcotics to the VALENTINE DTO in Connecticut and collecting narcotics proceeds. On November 25, 2020, U.S. Magistrate Judge Thomas O. Farrish granted orders/warrants to obtain pen register

data and E-911 location information for telephone number 951-350-9714, which is used by

██████████.

28.     On December 28, 2020, the CS informed investigators that a large quantity of fentanyl was going to be delivered by a courier to VALENTINE or a member of his DTO in Hartford, CT. The CS further advised that a courier, who was later identified as ███████ ████████ would be transporting the fentanyl from New York to Hartford, CT. At approximately 3:58 p.m. the CS informed investigators that ████████ was going to be delivering the fentanyl to 20 May Street, Hartford, CT.

29.     E-911 location data revealed that █████████ traveled from Far Rockaway, NY to East Hartford, CT. At approximately 7:56 p.m., E-911 location data indicated that the device was in East Hartford, CT near route 2. At approximately 7:57, investigators observed a small SUV pull onto May Street and into the area of 20 May Street, East Hartford, CT. The vehicle was a black Hyundai bearing a Florida license plate. At approximately the same time that the black Hyundai arrived on May Street in East Hartford, ████████ called the CS to inform him/her that he had arrived. During the call, █████████ was informed that he needed to deliver the fentanyl to 20 May Street in Hartford. Investigators then observed the Hyundai depart the area and begin traveling towards Hartford, CT.

30.     Investigators observed the black Hyundai park on the east curb line of May Street in Hartford, CT. During a monitored call between the CS and VALENTINE, VALENTINE was advised that the courier ████████ had arrived. Investigators then overheard VALENTINE making a telephone call to another individual and instructing the individual to go and meet the courier (█████████ out on the street. VALENTINE then told the CS that the individual that was going to be meeting █████████ would be wearing a black hoodie. Shortly thereafter,

15

investigators observed a black male wearing a black hoodie and gray sweatpants, who was later identified as Jamahl EDWARDS, emerge from the lower parking area of 20 May Street, Hartford, CT. Investigators observed EDWARDS as he walked north on May Street towards the black Hyundai. Investigators observed EDWARDS get into the front passenger seat of the black Hyundai.

31.   Ultimately, investigators conducted a stop of the black Hyundai. During the stop, investigators found ███████ in the driver's seat of the black Hyundai and EDWARDS in the front passenger seat. Investigators used a narcotics detection K-9 to conduct a sniff of the black Hyundai, which resulted in a positive alert by the K-9 to presence of the odor of narcotics. Investigators searched the black Hyundai and located a black duffle bag in the cargo hatch area that contained approximately 20 kilograms of fentanyl. No arrests were made at the time of the seizure. Investigators field-tested a portion of the fentanyl which produced a positive reaction for the presumptive presence of fentanyl.

### Information regarding Subject Premises #1

32.   This investigation has revealed that MATEO-SILVA resides at the single-family residential home located at 532 S Main St, New Britain, CT (**Subject Premises # 1**). Throughout this investigation, MATEO-SILVA has resided at **Subject Premises #1**. On multiple occasions during this investigation, investigators received authorization to obtain E-911 precision location information for phones used by MATEO-SILVA. E-911 information revealed that MATEO-SILVA was at **Subject Premises # 1** during the night-time and early morning hours consistent with MATEO-SILVA living at **Subject Premises # 1.** On multiple occasions during surveillance, investigators observed rental vehicles that were being rented by MATEO-SILVA, and vehicles known to be used by MATEO-SILVA, at **Subject Premises # 1** consistent with him living at the

residence. For example, during surveillance in the month of May 2021, investigators observed a white Jeep Grand Cherokee parked at **Subject Premises # 1**. Throughout this investigation, this vehicle has been identified as a vehicle used by MATEO-SILVA and other associates to facilitate narcotics-related transactions. The white Jeep was observed on surveillance during a narcotics-related transaction during the month of January 2021. Interestingly, the vehicle was observed at **Subject Premises # 1** prior to conducting the narcotics-related transaction. The vehicle also was observed at **Subject Premises # 1** after the narcotics-related transaction had taken place. Further, throughout the past year, investigators have periodically driven by **Subject Premises # 1** and often have observed rental vehicles parked in the driveway, through records check with rental agencies it was confirmed that MATEO-SILVA was the renter of these vehicles parked at **Subject Premises #1** consistent with MATEO-SILVA living at the residence.

33.     As his residence, there is probable cause to believe that **Subject Premises # 1** will contain evidence of MATEO-SILVA's narcotics trafficking activities, including, among other evidence, the following: money, drug ledgers, cellular telephones, records of cell phone services, proceeds of drug sales, evidence of money laundering, records of drug transactions, evidence of unexplained wealth, evidence of financial transactions, items used to process or package narcotics, records of travel, records of car rentals, names or contact information of narcotics trafficking associates, photographs of narcotics trafficking associates, addresses or telephone numbers in books, papers or electronic organizers, firearms, weapons, ammunition, safes, documentary evidence of ownership of residences, vehicles, storage containers, mail boxes and other assets. Given MATEO-SILVA's efforts to be careful and avoid detection by law enforcement, myself and other investigators believe that it is unlikely that MATEO-SILVA maintains a stash of narcotics at his residence (**Subject Premises # 1**). However, there is a strong

likelihood that **Subject Premises # 1** will contain substantial documentary evidence and records of MATEO-SILVA's narcotics trafficking and money launder activities. Examples of such evidence includes, among other evidence, the following:

      a.    Throughout this investigation, MATEO-SILVA has used multiple cellular telephones. Based on information from the CS, MATEO-SILVA will regularly contact the CS on several different telephone numbers, sometimes doing so on the same day. When preparing to transport a significant amount of narcotics and narcotics proceeds, MATEO-SILVA will obtain a new cell phone and provide a new cell phone to the CS. For example, the CS has provided numerous cell phone numbers to your affiant that have been used by MATEO-SILVA. The CS indicated that MATEO-SILVA would rarely use the same cell phone for any length of time, and always changed cell phones before conducting a narcotics-related transaction. There is probable cause to believe that **Subject Premises #1** will contain cell phones that are used by MATEO-SILVA, as well as documentary evidence of phones acquired by MATEO-SILVA or cell phone service used by MATEO-SILVA. Based on my training and experience, I know that cell phones are "tools of the trade" of narcotics trafficking and that cell phones often contain substantial evidence of narcotics trafficking and money laundering activities.

      b.    During this investigation, MATEO-SILVA has used multiple vehicles, including rental vehicles. For example, on January 30, 2021 when MATEO-SILVA was conducting a narcotics-related transaction, he was operating a gray minivan with Tennessee plates. Through a DMV check this vehicle was determined to be a rental vehicle. Rental information revealed that it had been rented to MATEO-SILVA. There is probable cause to believe that the **Subject Premises** will have records or documentary evidence of vehicles rented or used by MATEO-SILVA.

c.      On occasion, MATEO-SILVA has traveled to California to facilitate

narcotics transactions. There is probable cause to believe that **Subject Premises # 1** will have

documentary evidence of MATEO-SILVA's travel records to California or other locations in

furtherance of his narcotics trafficking activities.

d.      On multiple occasions, MATEO-SILVA and his associates have tried to

transfer large amounts of narcotics proceeds to a money broker so that the money could be

laundered and transferred to MATEO-SILVA's source of supply. There is probable cause to

believe that **Subject Premises #1** will have documentary evidence of financial transactions or

other efforts by MATEO-SILVA to launder or transfer narcotics proceeds.

e.      There is probable cause to believe that **Subject Premises # 1** will contain

evidence of MATEO-SILVA's unexplained wealth. As mentioned previously, during the month of

July 2020, investigators conducted enforcement actions that led to seizures of large amounts of

U.S. currency from this DTO. Some of these seizures occurred at an auto shop that was believed

to be maintained and utilized by MATEO-SILVA. When investigators went to 81 Charles St, they

found MATEO-SILVA and several associates at the location. When investigators searched 81

Charles St, they found resale quantities of narcotics, $106,965 in suspected narcotics proceeds

and other evidence.

f.      The CS has informed your affiant that MATEO-SILVA has obtained

another new auto shop since the seizures in July of 2020, and the CS believes that MATEO-

SILVA has significant amounts of money which has been utilized to purchase large quantities of

narcotics. There is a strong likelihood that **Subject Premises # 1** will contain documentary

evidence of MATEO-SILVA's ownership of vehicles, real estate property, business assets or other

19

property that was obtained with narcotics proceeds or that was used to facilitate narcotics trafficking activities.

       g.     In addition, **Subject Premises # 1** likely will contain U.S. Currency, records of bank accounts, investment accounts or other financial transactions, or other evidence of unexplained wealth obtained from narcotics trafficking.

       h.     MATEO-SILVA has numerous co-conspirators who have not been identified by law enforcement. For example, the CS has indicated that MATEO-SILVA is regularly sending unidentified individuals to California with large quantities of U.S. currency which is payment for narcotics purchases. There is probable cause to believe that **Subject Premises # 1** will have photographs, contact information, phone numbers or other identifying information regarding MATEO-SILVA's associates.

### Information regarding Subject Premises #2

34.     This investigation has revealed that VALENTINE spends significant time at **Subject Premises #2** and that it is occupied by family members of VALENTINE. Throughout this investigation, **Subject Premises #2** has been identified as a home that is occupied by VALENTINE's mother. On multiple occasions during this investigation, investigators received authorization to obtain E-911 precision location information for phones used by VALENTINE. E-911 information revealed that VALENTINE was at **Subject Premises #2** during the night-time and early morning hours consistent with VALENTINE sleeping at and spending considerable time at **Subject Premises #2.** During surveillance, investigators regularly observed a vehicle known to be used by VALENTINE at **Subject Premises #2** consistent with him staying at this location regularly. The vehicle was a blue Nissan Maxima bearing CT registration AM54633 which VALENTINE was seen regularly using. For example, on March 15, 2021, VALENTINE

conducted a money drop to an undercover officer for approximately $100,000 in U.S. currency. During the money drop, VALENTINE arrived in the blue Maxima and turned over a bag containing approximately $100,000 in U.S. currency to an undercover officer. This money was payment for narcotics that VALENTINE had previously obtained.

35.     As **Subject Premises #2** appears to be secondary residence used by VALENTINE where VALENTINE spends considerable time, there is probable cause to believe that **Subject Premises #2** will contain evidence of VALENTINE's narcotics trafficking activities, including, among other evidence, the following: money, drug ledgers, cellular telephones, records of cell phone services, proceeds of drug sales, evidence of money laundering, records of drug transactions, evidence of unexplained wealth, evidence of financial transactions, items used to process or package narcotics, records of travel, records of car rentals, names or contact information of narcotics trafficking associates, photographs of narcotics trafficking associates, addresses or telephone numbers in books, papers or electronic organizers, firearms, weapons, ammunition, safes, documentary evidence of ownership of residences, vehicles, storage containers, mail boxes and other assets. Given VALENTINE's efforts to be careful and avoid detection by law enforcement, myself and other investigators believe that it is unlikely that VALENTINE maintains narcotics at this location (**Subject Premises #2**). However, there is a strong likelihood that **Subject Premises #2** will contain substantial documentary evidence and records of VALENTINE's narcotics trafficking and money launder activities. Examples of such evidence includes, among other evidence, the following:

a.     Throughout this investigation, VALENTINE, like MATEO-SILVA, has used multiple cellular telephones to coordinate his narcotics trafficking activities. In fact, during the enforcement activities in July of 2020, investigators seized three cell phones from

21

VALENTINE's person/vehicle and four cell phones from his apartment. In addition, during July

of 2020, investigators were conducting electronic and physical surveillance on VALENTINE for

an extensive period of time. During surveillance, investigators observed VALENTINE exit 3

Lathrop Lane with a large black duffel bag that appeared to have considerable weight within it.

Investigators continued surveillance on VALENTINE as he traveled to Vernon, CT. Investigators

briefly lost visual of VALENTINE, however, E-911 data indicated that VALENTINE had

traveled to **Subject Premises #2**. Investigators regained physical surveillance on VALENTINE a

short time later as he traveled back to 3 Lathrop Lane from Vernon, CT. VALENTINE was

observed removing the black duffel bag from his vehicle and bringing it back inside of the

residence. Investigators observed the bag to appear empty when VALENTINE returned to 3

Lathrop Lane. It should be noted that during the subsequent search of 3 Lathrop Lane,

investigators located the black duffel bag inside of VALENTINE's apartment. The bag contained

several rubber bands that are consistent with bands used to organize large quantities of U.S.

currency. Your affiant believes that VALENTINE transported a large quantity of U.S. currency to

**Subject Premises #2** where it could be stored safely.

        b.     Since that time, VALENTINE has communicated with the CS and an

undercover officer using several different telephone numbers. VALENTINE will regularly obtain

a new telephone in order to conduct a large-scale transaction. For example, leading up to the

seizure of approximately 20 kilograms of fentanyl in December of 2020, VALENTINE informed

the CS that he would be obtaining a new telephone to use for the transaction. As another

example, during the month of May 2021, VALENTINE obtained a new telephone to begin

communicating with an undercover officer who was posing as a member of the Sinaloa cartel.

VALENTINE was communicating with the UC for the purposes of laundering a large quantity of

U.S. currency and also to obtain a large quantity of narcotics. There is probable cause to believe that **Subject Premises #2** will contain cell phones that are used by VALENTINE, as well as documentary evidence of phones acquired by VALENTINE or cell phone service used by VALENTINE. Based on my training and experience, I know that cell phones are integral to a narcotics trafficker's activities and that cell phones often contain substantial evidence of narcotics trafficking and money laundering activities.

        c.     During this investigation, VALENTINE has used multiple vehicles, including rental vehicles. For example, on February 23, 2021 when VALENTINE was conducting a narcotics-related transaction, he was operating a white Nissan Pathfinder with Tennessee plates. Through a DMV check this vehicle was determined to be a rental vehicle. There is probable cause to believe that **Subject Premises #2** will have records or documentary evidence of vehicles rented or used by VALENTINE.

        d.     As discussed herein, VALENTINE travels to California to facilitate narcotics transactions. There is probable cause to believe that **Subject Premises #2** will have documentary evidence of VALENTINE's travel records to California or other locations in furtherance of his narcotics trafficking activities.

        e.     On multiple occasions as mentioned above, VALENTINE and his associates have transferred large amounts of narcotics proceeds to a money broker so that the money could be laundered and transferred to VALENTINE's source of supply. There is probable cause to believe that **Subject Premises #2** will have documentary evidence of financial transactions or other efforts by VALENTINE to launder or transfer narcotics proceeds.

        f.     There is probable cause to believe that **Subject Premises #2**will contain evidence of VALENTINE's unexplained wealth. As mentioned previously, during the month of

July 2020, investigators conducted enforcement actions that led to seizures of large amounts of U.S. currency from multiple properties controlled by or used by VALENTINE. For example, investigators seized $572,722 from suitcases located inside VALENTINE's vehicle, $19,102 from inside VALENTINE's then-residence at 3 Lathrop Lane and $106,965 from inside a suspected stash location used by VALENTINE, MATEO-SILVA and their associates at 81 Charles Street. There is a strong likelihood that **Subject Premises #2** will contain documentary evidence of VALENTINE's ownership of real estate property or business assets. **Subject Premises #2** likely will contain U.S. Currency, records of bank accounts, investment accounts or other financial transactions, or other evidence of unexplained wealth from VALENTINE's narcotics trafficking.

   g. VALENTINE has numerous co-conspirators who have not been identified by law enforcement. For example, the CS has indicated that VALENTINE has an individual that is responsible for obtaining packages containing narcotics when they arrive in Connecticut. Throughout this investigation, it has not been revealed who this individual is. There is probable cause to believe that **Subject Premises #2** will have photographs, contact information, phone numbers or other identifying information regarding VALENTINE's associates who assist VALENTINE with his narcotics trafficking activities.

<u>**GENERAL INFORMATION REGARDING DRUG TRAFFICKING**</u>

  36. During my tenure as a law enforcement officer, I have investigated and participated in numerous operations which involved, in part, drug trafficking violations, the flow of the illegal proceeds obtained from drug trafficking, and related offenses such as violations of firearms laws. My involvement in these investigations has resulted in the successful prosecution of numerous individuals and the forfeiture of assets purchased with the proceeds from unlawful

24

drug trafficking, as well as assets used to facilitate these violations. Search warrants relating to these investigations have covered vehicles, businesses and residences of drug traffickers and their co-conspirators. In addition, these search warrants have also covered "stash houses" used as storage and distribution points for controlled substances and US currency used by drug dealers for their unlawful drug trafficking activities.

37.     Materials searched for and recovered in these locations have included various controlled substances; drug paraphernalia; books and records reflecting drug sales, the transfer or transportation of drugs and amounts of monies owed for drugs, records reflecting the names, addresses, and telephone numbers of co-conspirators, sales receipts and other records reflecting the expenditure of monies that are proceeds from unlawful drug distribution; currency and money wrappers; records of bank transactions made to conceal and launder drug trafficking proceeds; cellular telephones, paging devices, computers and computer disks, answering machines; and various valuable assets such as real property and automobiles that were purchased with the proceeds of unlawful drug trafficking. These items obtained during the executions of said search warrants, has constituted evidence of drug violations, the acquisitions of assets with drug trafficking proceeds, and the use of the assets to facilitate drug trafficking violations.

38.     Based on my training, experience and participation in this and other drug trafficking investigations, I know that:

a.     drug traffickers often place assets in the names other than their own to avoid detection of these assets by law enforcement;

b.     drug traffickers often place assets in the names of businesses and corporate entities as nominee title holders in order to avoid detection of these assets by law enforcement;

25

c.      even though these assets are placed in the names of other persons or entities, the drug traffickers actually own and continue to use these assets and exercise dominion and control over them;

d.      drug traffickers must maintain and have quick access to large amounts of United States currency, foreign currency, or other liquid assets in order to maintain and finance their ongoing drug business; these materials, as well as records, generally described below, are often kept and maintained within premises controlled or used by the drug traffickers within safes or lock boxes;

e.      drug traffickers maintain in their residences computerized or written books, records, receipts, diaries, ledgers, calendars, personal telephone/address books, airline tickets, airline schedules and airline receipts, cashier's checks, money orders, telephones with memory capabilities, telephone answering machines and telephone answering tapes, and other papers relating to the transportation, ordering, sale and distribution, of controlled substances and the outstanding debts and collections from controlled substances that have been distributed; these materials are often maintained within the electronic memory of personal computers, I-Pads or other computerized tablets, external hard drives, memory cards and "thumb drives" kept and maintained at premises under the control of the drug traffickers;

f.      drug traffickers commonly provide narcotics on consignment sale to their customers, who subsequently pay for the drugs after reselling the drugs. Therefore the above mentioned books, computerized records, records, receipts, notes, ledgers, et cetera, will be secured by the drug traffickers within their residences for their ready access to them for the purpose of determining drug debts and collecting monies derived from the sale of drugs;

g.      drug traffickers commonly conceal contraband, proceeds of drug

transactions, records of these transactions, and records reflecting names, nicknames, addresses and telephone and beeper numbers of drug associates within their residences, for ready access and to conceal them from law enforcement agencies;

        h.      drug traffickers commonly maintain records reflecting names, nicknames, addresses, and telephone numbers of both their current and past drug associates;

        i.      drug traffickers who are aware of an ongoing criminal investigation will often destroy an existing format of records reflecting their drug transactions. However, it is common for drug traffickers, particularly traffickers who provide or receive drugs on a consignment basis, to create another type of drug record to assist the trafficker in the collection of drug debts;

        j.      drug traffickers commonly use their homes to store records and/or receipts reflecting the collection of drug debts and the distribution of controlled substances, as well as records and receipts reflecting the expenditure of drug proceeds for personal and business assets;

        k.      drug traffickers will commonly conceal within their residences or within the curtilage of their residences, quantities of narcotics, large amounts of currency, firearms, financial instruments, jewelry, electronic equipment and other items of value and proceeds of drug transactions and evidence of financial transactions relating to obtaining, transferring, secreting, and spending large sums of money derived from drug trafficking;

        l.      drug traffickers will attempt to legitimize the profits from illegal drug transactions by using domestic banks and their attendant services such as safe deposit boxes, securities, cashier's checks, money drafts, letters of credit, brokerage houses, real estate and business fronts;

        m.      persons involved in drug trafficking who are aware of a criminal

27

investigation into their financial drug activities, will conceal, liquidate, and transfer easily movable drug derived assets in order to prevent law enforcement agencies from seizing and forfeiting their assets;

      n.     drug traffickers often have photographs, slides, or video movies of themselves, their co-conspirators and the property and assets purchased with drug proceeds. These photographs and video movies are normally in the drug traffickers possession or residence;

      o.     The State of Connecticut is generally viewed as a consumer state in regards to narcotic activity. However it is common for drug traffickers to travel to major distribution centers such as New York to purchase their narcotics for distribution. It is known that after purchasing these narcotics, drug traffickers will transport these narcotics or cause them to be transported to those areas in which they will be distributed to their customers. It is known that drug traffickers' methods include, but are not limited to: commercial airlines, private motor vehicles, tractor trailer units, public transportation, and motor vehicles with concealed compartments, and government and contract mail carriers. It is known that the residences of drug traffickers will often contain records of drug related travel. These records may include airline ticket receipts, credit card receipts, rental car receipts and luggage tags reflecting points of travel;

      p.     based on my training and experience, drug traffickers commonly have firearms and other weapons in their possession, in their cars, on their person, at their residence including, but not limited to handguns, rifles, shotguns, automatic weapons, and knives. These firearms and weapons are most often kept to protect and secure drug traffickers' property;

      q.     based on my training, experience and participation in this and other drug trafficking investigations, I know that it is generally a common practice for drug traffickers to

28

store their drug inventory and drug related paraphernalia in their residences, cars or those of

trusted associates. This paraphernalia frequently includes scales, funnels, sifters, grinders, plastic

bags, heat sealing devices, and dilutant;

r.      based on my training and experience, drug dealers often create secret

locations, commonly called "traps," in their automobiles. Often, drug dealers will use these

automobiles to store narcotics, weapons, money and other items and documents related to their

drug trade; and

s.      based on my training, experience and participation in this and other drug

trafficking investigations, I know that drug traffickers often possess, maintain and control other

items related to their drug trafficking activities, as described in Attachment A to this affidavit, in

their cars, homes, garages and out-buildings, and in safes or lock boxes maintained at such

locations.

## CONCLUSION

39.     On the basis of the foregoing information, there is probable cause to believe, and I

do believe, to support the criminal complaints and arrest warrants charging Shabazz

VALENTINE, Rigoberto MATEO-SILVA, a.k.a. "BORI", ▓▓▓▓ ▓▓▓▓ Jamahl

EDWARDS and ▓▓▓▓ ▓▓▓▓▓▓ a.k.a. ▓▓▓▓▓▓▓▓ with violations of 21 U.S.C.

§§ 841(a)(1) and 846 (conspiracy to possess with intent to distribute and to distribute controlled

substances) and 21 U.S.C. § 841(a)(1) (possession with intent to distribute and distribution of

controlled substances).

40.     On the basis of the foregoing information, there is probable cause to believe, and I

do believe, that the items described in Attachment A, which are fruits, instrumentalities and

evidence of the Target Offenses, will be found at or within **Subject Premises #1** and **Subject**

**Premises #2.**

41.     Because this is an application that pertains to an ongoing criminal investigation, and because disclosure of the information contained herein as well as disclosure of the warrants and complaints being requested herein may compromise the investigation and increase the risk of harm for the law enforcement officers responsible for conducting the arrests and searches, I request that the warrants, applications, complaints and this affidavit be ordered sealed by the Court, until further order of the Court.

MICHAEL BREEN (Affiliate)
Digitally signed by MICHAEL BREEN (Affiliate)
Date: 2021.06.24 13:07:27 -04'00'

_____
Michael A. Breen
Task Force Officer
Drug Enforcement Administration

The truth of the foregoing affidavit has been attested to me by DEA Task Force Officer Michael Breen over the telephone on June ___24___, 2021.

Robert A. Richardson
Digitally signed by Robert A. Richardson
Date: 2021.06.24 14:07:12 -04'00'

_____
Hon. Robert A. Richardson
United States Magistrate Judge